UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 22-cv-10589 |
| Plaintiff, | |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| GLEN POINT CAPITAL ADVISORS LP, GLEN POINT CAPITAL LLP, and NEIL PHILLIPS, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

## I.     SUMMARY

1.      In late December 2017, during the light, low volume trading days of the holiday season, Defendant Neil Phillips ("Phillips") engaged in a deceptive and manipulative scheme (the "Manipulative Scheme") to illegally trigger payouts on two large option contracts (the "OT Options") totaling $30 million.

2.      Phillips executed the Manipulative Scheme in his capacity as the Co-Chief Investment Officer ("Co-CIO") and principal owner of Defendants Glen Point Capital Advisors LP ("GPCA") and Glen Point Capital LLP ("GPC"), two CFTC-registered Commodity Pool Operators ("CPOs") that Phillips founded and controlled.

3.      GPCA and GPC (collectively, "Glen Point Capital") acted as a common enterprise and jointly managed investments for a commodity pool known as the Glen Point Master Fund Limited (the "GP Master Fund") and another client that also operated as a

commodity pool ("Client 1") (collectively, the "Glen Point Commodity Pools"), both of which were parties to the OT Options.

4.     The OT Options, which constituted swaps under the Commodity Exchange Act ("Act"), were tied to the U.S. dollar ("USD") to South African rand ("ZAR") exchange rate.

5.     Under the express terms of the OT Options, if the USD/ZAR exchange rate fell below certain price levels, the contracts would pay out $30 million, in total, to the Glen Point Commodity Pools.  If the exchange rate did not fall below those levels, the contracts would pay nothing.

6.     On December 25 and 28, 2017, Phillips engaged in a scheme to intentionally and artificially drive down the USD/ZAR exchange rate to levels that would trigger $30 million in payouts on the OT Options.

7.     At that time, Phillips knew that only a few days remained for the USD/ZAR exchange rate to hit the predetermined amounts or else the OT Options would expire worthless.

8.     Rather than allowing non-manipulative, free market forces to determine whether the USD/ZAR exchange rate would breach the predetermined amounts before the OT Options expired, Phillips took matters into his own hands.

9.     Phillips orchestrated the trading of massive amounts of the USD/ZAR currency pair in the foreign exchange ("FX") spot market for the express purpose of pushing the exchange rate down to the exact levels he needed to trigger the OT Options.

10.     Phillips's scheme was successful and directly resulted in $30 million in payouts for the Glen Point Commodity Pools.

11.     Through this conduct and the conduct further described herein, Phillips and Glen Point Capital (collectively, "Defendants") violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1),

and Commission Regulations ("Regulations") 166.3 and 180.1(a), 17 C.F.R. §§ 166.3, 180.1(a) (2021).

12.     Phillips committed the acts and omissions alleged herein within the scope of his employment or office at Glen Point Capital.  Therefore, Glen Point Capital is liable as a principal for all of Phillips's acts and omissions pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

13.     Phillips controlled Glen Point Capital at all times relevant to this Complaint, including from December 2017 to January 2018 (the "Relevant Period"), and failed to act in good faith or knowingly induced Glen Point Capital's violations of the Act and Regulations alleged herein.  Therefore, Phillips is liable for Glen Point Capital's violations of the Act and Regulations as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

14.     Unless restrained and enjoined by this Court, Phillips, and Glen Point Capital directly or through its corporate successors, are likely to continue to engage in the acts and practices alleged in this Complaint, and in similar illegal acts and practices.

15.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to permanently enjoin Defendants from further violations of the Act and Regulations.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including but not limited to trading and registration bans, restitution, disgorgement, pre- and post-judgment interest, and such other and further relief as this Court deems necessary and appropriate.

## II.     **JURISDICTION AND VENUE**

16.     **Jurisdiction**.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that

district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

17.     **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District, and because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

### III.     THE PARTIES

18.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.  The Commission's mission is to promote the integrity, resilience, and vibrancy of the U.S. derivatives markets through sound regulation, which includes among other things, oversight of market participants, including the entities described below, that voluntarily register with the Commission to engage in the U.S. derivatives markets.

19.     Defendant **Neil Phillips** is a natural person with a last known residence in the United Kingdom.  Phillips was the co-founder and Co-CIO of Glen Point Capital.  Phillips holds a majority ownership interest in GPC and is a principal owner of GPCA.  He was registered with the Commission to conduct business in the U.S. derivatives markets as an Associated Person of

4

GPC from January 2016 to January 2021.  Since December 2015, GPC has identified Phillips as a "Principal" of the firm in its filings with the National Futures Association ("NFA"), which is the sole, Commission-registered self-regulatory organization for the U.S. futures and derivatives markets.  GPCA has identified Phillips as a "Principal" of the firm in its filings with the NFA since August 2017.  During the Relevant Period, Phillips, by and through GPCA, regularly transacted business in New York.

20.     On September 1, 2022, the United States Attorney's Office for the Southern District of New York announced the unsealing of an indictment against Phillips charging him with (1) conspiracy to commit commodities fraud; (2) conspiracy to commit wire fraud; (3) commodities fraud; and (4) wire fraud based on substantially similar facts to those alleged in this Complaint.  *See* Indictment, *United States v. Phillips*, 22-cr-00138 (S.D.N.Y. Mar. 3, 2022), ECF No. 2.  On information and belief, Phillips will be extradited to this District in connection with the criminal proceedings.

21.     Defendant **Glen Point Capital Advisors LP** is a limited partnership incorporated in Delaware and headquartered in New York, New York.  It has been registered with the Commission to conduct business in the U.S. derivatives markets as a CPO since September 2017 and was a Member of the NFA from September 2017 to June 2022.  GPCA was also registered with the Securities and Exchange Commission ("SEC") as an investment adviser pursuant to the Investment Advisers Act of 1940 from September 2017 to March 2022.  During the Relevant Period, GPCA and GPC co-managed and co-operated the GP Master Fund.  Additionally, during the Relevant Period, GPCA transacted business within New York by, among other things, maintaining and staffing an office in New York; engaging in commodity interest trading from its office in New York; entering into contracts with New York entities; registering with the

Commission as a CPO headquartered and conducting business from New York; communicating from its office in New York with existing and potential fund participants; and routinely trading and communicating via Bloomberg chat rooms, including at least one of the chat rooms in which Phillips engaged in the Manipulative Scheme, from its office in New York.

22.     Defendant **Glen Point Capital LLP** is a limited liability partnership incorporated and headquartered in the United Kingdom.  It has been registered with the Commission to conduct business in the U.S. derivatives markets as a CPO since January 2016 and was a Member of the NFA from January 2016 to June 2022.  GPC was also registered with the SEC as an investment adviser pursuant to the Investment Advisers Act of 1940 from May 2016 to March 2022.  During the Relevant Period, GPC and GPCA co-managed and co-operated the GP Master Fund.  Additionally, during the Relevant Period, GPC transacted business within New York by, among other things, registering with the Commission in the United States to operate a commodity pool under the Act, which was open to New York participants; and co-operating and co-managing as a common enterprise one or more commodity pools under the Act with GPCA, a New York entity that maintained and conducted business out of its office in New York.

### IV.     ADDITIONAL RELEVANT ENTITIES

23.     The **GP Master Fund** is a commodity pool under the Act.  The GP Master Fund has two feeder funds, including one based in the United States:  Glen Point Global Macro Fund LP, a Delaware limited partnership, and Glen Point Global Macro Fund Limited, a Cayman Islands exempted company (collectively, the "Feeder Funds").  A feeder fund is an investment vehicle that pools capital commitments of investors and invests or "feeds" such capital into an overarching umbrella fund, known as a master fund, for which a single designated investment manager (here, Glen Point Capital) handles all portfolio investments and trading.  During the

Relevant Period, the GP Master Fund had at least twenty pool participants in the United States across its Feeder Funds, and Glen Point Capital managed and operated the GP Master Fund from offices in New York and London.  Phillips directed the day-to-day management of the investments and assets held by the GP Master Fund.  Along with other entities described below, the GP Master Fund was a party to the OT Options.

24.     **Client 1** is a limited partnership that functions as a pooled investment vehicle. During the Relevant Period, Glen Point Capital managed certain investments for Client 1, and Phillips directed the day-to-day management of the account Client 1 held with Glen Point Capital.  Along with the GP Master Fund and other entities described below, Client 1 was a party to the OT Options.  Client 1's principal investment advisor and manager was a company headquartered in New York, New York.

25.     **Intermediary Firm 1** is a private limited company and financial services firm that is provisionally registered with the Commission as a Swap Dealer.  Intermediary Firm 1 acted as the liquidity provider to Glen Point Capital in connection with the execution of the "one touch" binary option that Phillips unlawfully triggered on December 25, 2017 ("OT Option 1").

26.     **Prime Broker 1** is a U.S. federally-chartered national banking association that is provisionally registered with the Commission as a Swap Dealer with its main office in New York, New York.  Prime Broker 1 was prime broker to the Glen Point Commodity Pools with respect to the OT Options.

27.     **Bank 1** is a public limited company that is provisionally registered with the Commission as a Swap Dealer and is a subsidiary of a bank headquartered in New York, New York.  Bank 1 was the party ultimately obligated to pay out $20 million on OT Option 1 if the USD/ZAR exchange rate fell below 12.50 rand per dollar before expiration.

28.    **Bank 2** is a private unlimited company that is provisionally registered with the Commission as a Swap Dealer.  Pursuant to the terms of a second "one touch" binary option that Phillips illegally triggered on December 28, 2017 ("OT Option 2"), Bank 2 was obligated to pay out $10 million if the USD/ZAR exchange rate fell below 12.25 rand per dollar before expiration.

29.    **Bank 3** is a securities brokerage firm that executed the USD/ZAR spot trades at issue on behalf of its client, Glen Point Capital.

30.    **The Settlement Bank** is an Edge Act Corporation headquartered in New York, New York and chartered by the Federal Reserve Board that provides trade settlement services for FX transactions, including a substantial portion of all worldwide FX transactions involving USD. The Settlement Bank settled the USD/ZAR spot trades that Phillips executed through Bank 3, in New York, by among other things, accepting and making payments in U.S. dollars via accounts held at the Federal Reserve Bank of New York in New York.

31.    **The Federal Reserve Bank of New York** is headquartered in New York, New York and is one of twelve regional banks that make up the Federal Reserve System of the United States.  The Settlement Bank maintains an account at the Federal Reserve Bank of New York that it uses to settle FX transactions involving USD on behalf of its members.  Along with the other Federal Reserve Banks, the Federal Reserve Bank of New York owns and operates the Fedwire Funds Service ("Fedwire"), which is an electronic funds-transfer service, located in the United States, utilized by banks, businesses, and government agencies.

32.    **The International Swaps and Derivatives Association** ("ISDA") is a private trade organization headquartered in New York, New York whose members transact in the over-the-counter ("OTC") derivatives market.  ISDA has created a standardized contract known as the

8

ISDA Master Agreement that is regularly used to govern OTC derivatives transactions.

33.     **The DTCC Data Repository (U.S.) LLC** ("DTCC") is a Swap Data Repository registered with the Commission and located in New York, New York, which provides a regulatory reporting solution for derivative market participants to fulfill their reporting obligations under the Regulations.  Prime Broker 1 submitted information related to the execution and triggering of OT Option 1 and the execution of OT Option 2 to the DTCC.  Bank 2 also submitted information related to the execution of OT Option 2 to the DTCC.

## V.     FACTS

### A.     Background on the FX Market and the Settlement of Spot Transactions

34.     The FX market, in which participants are able to buy, sell, exchange, and speculate on currencies, is one of the world's largest and most actively traded financial markets. The FX market determines the exchange rate for currencies around the world and remains open twenty-four hours a day, five days a week, including most holidays.

35.     FX trading takes place electronically between multinational banks, corporations, hedge funds, and other participants.

36.     Currencies are traded in pairs, such as USD/ZAR, with the value of one currency being quoted against the other.

37.     All FX trades involve the simultaneous purchase of one currency in the pair and sale of the other.  The transacted rate (i.e., the exchange rate or "spot" rate) represents the amount of the second listed currency that a participant would receive in return for selling one unit of the first listed currency.  For example, an exchange rate of 12.50 rand per dollar would mean that a party could sell 1.00 USD in return for 12.50 ZAR.  Likewise, an exchange rate of 12.25 rand per dollar would mean that a party could sell 1.00 USD in return for 12.25 ZAR.

9

38.     In an FX spot trade, a party agrees to receive a specified quantity of one currency in exchange for delivering the other currency, at the current exchange rate.  The settlement of the trade—meaning the actual delivery of the relevant currencies to each party—typically occurs within two business days.

39.     Spot transactions occur OTC rather than through a central exchange.  As a result, there is no single, official marketplace for FX transactions, and customers depend on financial institutions to act as dealers willing to continuously buy and sell currencies, in large amounts, at their request.

40.     The Settlement Bank settles a substantial portion of FX spot transactions that involve the USD.  The Settlement Bank settles trades in multiple currencies, including USD and ZAR, in New York.

41.     Firms that choose to use the Settlement Bank to settle their currency trades become "settlement members" of the company.  Settlement members each have a multicurrency account with the Settlement Bank.  Following an FX transaction, settlement members submit the details of the trade and payment instructions to the Settlement Bank.  Members may submit instructions relating to their own FX transactions as well as the FX transactions of their third-party customers directly to the Settlement Bank.  These instructions are authenticated and matched by the Settlement Bank.

42.     For all transactions submitted to the Settlement Bank for settlement on a particular date, the Settlement Bank calculates the funding required of each settlement member on a multilateral netted basis.  The Settlement Bank then creates a payment schedule, which will reflect whether a member must pay in or receive money.

43.     The Settlement Bank holds accounts with the central banks that control each of

the currencies that can be settled in the Settlement Bank's system, including with the Federal Reserve Bank of New York. Settlement members pay and receive funds through the Settlement Bank's central bank account in each currency.

44.     If a member bank is due to pay USD, the member will pay the dollars to the Settlement Bank via Fedwire, the electronic funds-transfer service operated by the U.S. Federal Reserve Banks. The member will either directly pay the dollars, or it will direct a third-party institution to do so, depending on whether the member is a participant in Fedwire. The member due to pay will deliver the funds to the Settlement Bank's account at the Federal Reserve Bank of New York, and the Settlement Bank then will distribute the dollars to the relevant member due to receive them.

45.     The settlement of the payment instructions and the associated payments are final and irrevocable.

## B.     Defendant Phillips Co-Founds Glen Point Capital

46.     In or around September 2015, Phillips co-founded GPC for the purpose of launching and managing certain private pooled investment vehicles, including but not limited to the GP Master Fund. Phillips has held a majority ownership stake in GPC since its founding.

47.     On or about November 18, 2015, GPC voluntarily sought, and later obtained, registration with the Commission as a CPO to solicit and manage commodity pools, enterprises in which funds are combined for the purpose of trading futures or options on futures, retail off-exchange forex contracts, or swaps, or to invest in other commodity pools.

48.     In or around August 2017, Phillips and his business partner co-founded GPCA. Phillips has been a principal owner of GPCA since its founding.

49.     On or about August 29, 2017, GPCA voluntarily sought, and later obtained,

registration with the Commission as a CPO to solicit and manage commodity pools, enterprises in which funds are combined for the purpose of trading futures or options on futures, retail off-exchange forex contracts, or swaps, or to invest in other commodity pools.

50.     During the Relevant Period, GPCA and GPC acted as a common enterprise and are described together in this Complaint as "Glen Point Capital."  They shared common employees and officers and were under ultimate common ownership and control.  They shared common legal and compliance resources and maintained their books and records together in the same locations.  Employees of GPCA and GPC regularly communicated with one another to coordinate and collaborate on trading and were subject to the same global compliance manual. GPCA and GPC both conducted business under the name "Glen Point Capital" as opposed to distinguishing between legal entities.  They advertised on a single website, and employees of the two entities used "@glenpointcapital.com" email addresses.  For all intents and purposes, GPCA and GPC are functionally the same company.

51.     Indeed, during the Relevant Period, GPCA and GPC jointly managed, and were equally responsible for, the portfolios of the Glen Point Commodity Pools.  As they publicly represented in their registration and reporting filings with the SEC, GPCA and GPC "function[ed] as a single unit in providing investment management services to [their] clients" and were under "common control."

52.      In addition, in both their filings with the SEC and their Pool Quarterly Reports filed with the Commission, GPCA and GPC each identified having the *exact to the dollar* same total amount of assets under management—**$2,729,579,073**—as of the final reporting period of 2017.  They also explicitly acknowledged in their filings with the SEC that they managed the same clients and that their disclosure documents contained "duplicative" figures and information.

53.     Throughout the Relevant Period, as a Principal and Co-CIO of Glen Point Capital, Phillips directed the day-to-day management of the investments and assets held by the Glen Point Commodity Pools.

54.      Under his management, the GP Master Fund generally focused on macroeconomic trends and emerging markets and invested and traded in debt securities, derivatives (including futures contracts), currencies, equities, credit, and commodity products. Glen Point Capital pursued the same investment strategy for Client 1's managed account as it did for the GP Master Fund.

55.     Phillips exercised complete discretion to buy, sell, retain, execute, negotiate, settle, or otherwise deal in investments and effect transactions on behalf of the Glen Point Commodity Pools.  While other employees of the Glen Point Capital enterprise managed certain trading activities, those individuals all ultimately acted under the direction and control of Phillips.

**C.     Glen Point Capital Executes the OT Options**

**1.     OT Option 1**

56.     On or about October 30, 2017, the Glen Point Commodity Pools entered into OT Option 1.  OT Option 1 was a "one-touch" binary option that was set to expire on January 2, 2018.

57.     A one-touch option entitles the purchaser to receive payment of a fixed amount of money if the spot price of the underlying currency "touches" a certain level before the option expires.  The buyer pays a premium for the option, which the seller keeps as profit if the level is not triggered.  There are only two possible outcomes of the transaction under the terms of the contract: either (1) the option pays the full predetermined amount or (2) it expires without

payment.

58.     The execution and settlement of OT Option 1 occurred through a series of trades involving the ultimate counterparties to the transaction—the GP Master Fund, Client 1, and Bank 1—as well as several intermediaries.

59.     On or about October 30, 2017, Glen Point Capital contacted Intermediary Firm 1 to purchase OT Option 1 on behalf of the Glen Point Commodity Pools.  In response, Intermediary Firm 1, acting through its own prime broker, initiated a sequence of trades to procure OT Option 1 and transfer it to the Glen Point Commodity Pools.  Specifically, Intermediary Firm 1 facilitated a trade to purchase OT Option 1 from Bank 1.  Intermediary Firm 1 paid Bank 1 a premium of $2.05 million in connection with that transaction on behalf of the Glen Point Commodity Pools.  Then, Intermediary Firm 1 transferred OT Option 1 to the Glen Point Commodity Pools via Prime Broker 1, which acted as prime broker to the Glen Point Commodity Pools and facilitated the execution and settlement of OT Option 1.

60.     Intermediary Firm 1 permitted its client, Glen Point Capital, to maintain anonymity in this transaction.  Accordingly, as far as Bank 1 was aware, Intermediary Firm 1 was facilitating the trade on behalf of an anonymous underlying client.

61.     After OT Option 1 was executed, Bank 1 transferred the risk of OT Option 1 and the associated premium payment to one of its affiliates located in the United States.

62.     The terms of OT Option 1 provided that Bank 1 would pay a total of $20 million if the USD/ZAR spot rate hit or "touched" the barrier level of 12.50 rand per dollar (the "Barrier Event") at any time between the trade date (October 30, 2017) and the expiration date (January 2, 2018).  Glen Point Capital arranged the transaction such that the GP Master Fund would receive $15,660,000 and Client 1 would receive $4,340,000 if OT Option 1 were triggered.

63.     The GP Master Fund entered into a letter agreement with Prime Broker 1 dated October 30, 2017, that confirmed the terms and conditions of OT Option 1.

64.     Pursuant to the letter agreement, the GP Master Fund served as the "Calculation Agent" for purposes of OT Option 1 and agreed to "act[] in good faith and in a commercially reasonable manner."

65.     The letter agreement formed part of an ISDA Master Agreement between Prime Broker 1 and the GP Master Fund dated December 10, 2015 and expressly incorporated the "2005 Barrier Option Supplement" published by ISDA.

66.     The 2005 Barrier Option Supplement stated that the "Barrier Determination Agent" is "the party who determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred" and that the "Barrier Determination Agent shall be the Calculation Agent" unless otherwise specified.

67.     The 2005 Barrier Option Supplement also stated that "occurrence of a Barrier Event shall be determined in good faith and in a commercially reasonable manner by the Barrier Determination Agent."

68.     Client 1 entered into a nearly identical letter agreement with Prime Broker 1 in connection with OT Option 1 that formed part of an ISDA Master Agreement between those parties dated November 14, 2001.

69.     On or about November 1, 2017, the GP Master Fund and Client 1 paid premium amounts of $1,624,725 and $450,275, respectively, via Prime Broker 1 in connection with the purchase of OT Option 1.

70.     A portion of the funds used to satisfy the premium payments originated from a U.S.-based account held in the name of the GP Master Fund at an investment management

company with its principal office in New York, New York ("GP Master Fund's U.S. Account"). This New York-based investment management company is registered with the Commission as a Futures Commission Merchant and provisionally registered with the Commission as a Swap Dealer.  Client 1's premium payment originated from a U.S.-based account held in its name at a third-party institution ("Client 1's U.S. Account").

71.     The funds used to enter into OT Option 1 originated in part from the U.S. participants in the Feeder Funds and from the U.S.-based Feeder Fund itself.

72.     On or about October 30, 2017 and on subsequent occasions, Prime Broker 1 submitted information related to the execution of OT Option 1 to the DTCC, a CFTC-registered Swap Data Repository located in New York, New York.  In its submissions, Prime Broker 1 identified itself as a "U.S. Person" pursuant to Part 45 of the Regulations.  DTCC records related to OT Option 1 also identify Client 1 as a "U.S. Person" and its domicile as "USA" for purposes of those same Regulations.

**2.     OT Option 2**

73.     On or about November 28, 2017, the Glen Point Commodity Pools entered into OT Option 2 with Bank 2.  OT Option 2 was another "one-touch" binary option that was set to expire on January 15, 2018.

74.     The terms of OT Option 2 provided that Bank 2 would pay a total of $10 million if the USD/ZAR spot rate hit or "touched" the barrier level of 12.25 rand per dollar at any time between the trade date (November 28, 2017) and the expiration date (January 15, 2018).  Glen Point Capital arranged the transaction so that the OT Option 2 position (including the $10 million payout) would be allocated to the Glen Point Commodity Pools.

75.     As was the case with OT Option 1, Prime Broker 1 acted as prime broker to the

16

Glen Point Commodity Pools and facilitated the execution and settlement of OT Option 2.  The GP Master Fund and Client 1 both entered into letter agreements with Prime Broker 1 dated November 28, 2017, that confirmed the terms and conditions of OT Option 2 and reiterated that a "Barrier Event" would occur if the exchange rate for the USD/ZAR currency pair was less than or equal to 12.25 rand per dollar.

76.     On or about November 30, 2017, the GP Master Fund and Client 1 paid premium amounts of $622,520 and $167,480, respectively, via Prime Broker 1 in connection with the purchase of OT Option 2.  The funds used to satisfy the premium payments originated from the GP Master Fund's U.S. Account and Client 1's U.S. Account.

77.     The funds used to enter into OT Option 2 originated in part from the U.S. participants in the Feeder Funds and from the U.S.-based Feeder Fund itself.

78.     On or about November 28, 2017, Bank 2 and Prime Broker 1 submitted information related to the execution of OT Option 2 to the DTCC.  In its submissions, Prime Broker 1 identified itself and Client 1 as "U.S. Persons" pursuant to Part 45 of the Regulations.

**3.      The OT Options Had a Direct and Significant Connection With Activities in, or Effect on, U.S. Commerce**

79.     The OT Options constitute swaps under the Act.

80.     The activities alleged herein relating to the OT Options, including Phillips's manipulation of the spot price of the USD/ZAR currency pair to trigger payouts on the OT Options, had a direct and significant connection with activities in, or effect on, commerce of the United States.  The OT Options triggered by the Manipulative Scheme were instruments regulated under the Act that involved multiple U.S.-based and CFTC-registered entities.

81.     The activities also involved a substantial quantity of USD and directly affected significant American interests, including the currency of the United States.  Phillips's conduct

affected the prices for USD/ZAR at which counterparties, including at least one counterparty in the United States, purchased or sold USD.  Additionally, Phillips's manipulative trades were settled through a settlement bank in the United States, which facilitated transfers of a substantial quantity of USD in, and out of, bank accounts held at the Federal Reserve Bank of New York.

**D.**   **Phillips Executes His Manipulative Scheme on Two Occasions**

      **1.**   **Phillips Orders Aggressive USD/ZAR Spot Trades on Christmas Day to Push Prices Down to Trigger the $20 Million Payout on OT Option 1**

82.      On Christmas Day, December 25, 2017, knowing that OT Option 1 was set to expire in a few days, Phillips sought to and did in fact manipulate the USD/ZAR exchange rate to drive it down below the barrier level of 12.50 rand per dollar by engaging in spot trading to trigger the $20 million payout on OT Option 1.

83.      At or around 6:49 p.m. ET (11:49 p.m. UTC), Phillips contacted traders at Bank 3, an FX dealer, via a Bloomberg chat room, asking them to sell the USD/ZAR currency pair in the spot market for him.

84.      By engaging in USD/ZAR spot trades in which he sold massive amounts of USD in exchange for ZAR, Phillips intended to create an artificial demand for the ZAR, which had the impact of strengthening the ZAR against the USD (i.e., as demand for ZAR increased the ZAR became more expensive).  This strengthening of the ZAR against the USD meant that the exchange rate lowered (i.e., a seller of USD would receive less ZAR in return because the ZAR had now become more expensive).

85.      Throughout the Relevant Period and at this time in particular, Phillips was closely monitoring movements in the USD/ZAR exchange rate and the time remaining on the OT Options.

86.      At the time Phillips contacted Bank 3, there were very few participants in the

18

market trading USD/ZAR—that is, there was very little liquidity and trading because of the

holidays—and the currency pair was trading at around 12.62 rand per dollar.

87.     Phillips initially asked a salesperson at Bank 3, SP 1, to sell $25 million USD in

exchange for ZAR.  SP 1 and Phillips then engaged in the following discussion (emphasis

supplied):

> SP 1:     **liquidity very thin, will keep you posted here**
> Phillips:  Let me know when u done
> SP 1:     Neil just fyg [sic] it is 12.58/12.65 in tiny, **nothing has traded today at all**
> SP 1:     We will have to go very slowly to minimize impact
> Phillips:  U will find liqiidity [sic]
> Phillips:  Don't worry
> Phillips:  **I need to be done in 8 mi ns [sic]**

88.     SP 1, working with a Bank 3 trader, proceeded to execute Phillips's order in the

span of approximately ten minutes.

89.     After filling the order, SP 1 informed Phillips that his trades had reached a low of

12.5675 rand per dollar and that SP 1 expected that price to be the "low print" for the day.

90.     With the exchange rate now hovering less than .07 rand per dollar from the barrier

level Phillips needed to trigger the payout on OT Option 1, Phillips expressed an interest in

placing additional orders and doing so as quickly as possible.

91.      In response, SP 1 cautioned Phillips against trying to sell the USD/ZAR pair too

quickly or in too large a volume because doing so could trigger others in the market to sell,

which would drive the rate down and in turn make selling less profitable.

92.     In short, SP 1 warned Phillips that his proposed trading was irrational.

93.     Moments later, despite SP 1's warning, Phillips messaged SP 1 to sell more

USD/ZAR.  Like the first $25 million he sold, Phillips's intent in placing additional sell orders

was to push the exchange rate even further down towards the Barrier Event associated with OT

Option 1.

94.     Phillips's efforts to manipulate the market—and therefore manufacture the Barrier Event—meant that as he continued to trade USD/ZAR, his own orders had the effect of driving down the price at which he could sell the currency pair.  Phillips's trading strategy was irrational and only makes sense when viewed together with the upside of triggering OT Option 1 and the resulting windfall.

95.     Phillips first asked SP 1 to sell $50 million and gave the following instructions:

> Phillips:  K can u sell 50 and try get thru 50 inn5 [sic] mins
> SP 1:      ok sure
> Phillips:  My aim.is [sic] to trade thru 50
> SP 1:      ok sure
> Phillips:  Let me k now [sic] how we going

96.     At the time of these messages, bids to buy USD/ZAR were at or around 12.565 rand per dollar.  When Phillips stated that his aim was to trade through "50," he meant trade through 12.50 rand per dollar, which was the rate that would trigger the Barrier Event and the $20 million payout.

97.     Over the course of the next thirty-five minutes, Phillips instructed SP 1 to sell massive amounts of USD/ZAR in amounts ranging from $50 million to $200 million.  Phillips admitted to SP 1 multiple times during this exchange that he "needed" the USD/ZAR currency pair to "trade thru 50," again meaning that he needed the USD/ZAR exchange rate to hit 12.50 rand per dollar, which unbeknownst to SP 1, would trigger the payout on OT Option 1.

98.     At one point, SP 1 provided the following update:

> SP 1:      there are still strong bids despite our aggressive offers here, market has
>            tightened up substantially now . . . about 50 pips wide
> Phillips:  How much liquidity do u think between now and 50
> SP 1:      the algos are buying right now, i'm not sure how much depth they have
> SP 1:      we are the only sellers in the market, we've sold about 100 and it's
>            moved about 5 big figures . . . .

SP 1:    but i imagine there is much more depth on the bid the closer we get to 12.50
Phillips:  Like how much
SP 1:    we can't know until we get closer but id say something like 150
Phillips:  K can u sell 200
SP 1:    more?
Phillips:  Up.to 200
Phillips:  Yes
SP 1:    so that would take us to 325 all day
Phillips:  Thru 50
SP 1:    ok
Phillips:  Yes
SP 1:    doing it now
Phillips:  Keep me posted
SP 1:    will do
Phillips:  Need it to trade thru 50
Phillips:  4990 is fine

99.    As the exchange rate approached 12.5050 rand per dollar (i.e., only .0050 rand per dollar from the Barrier Event), the following exchange occurred between Phillips and SP 1:

Phillips:  How much more u think to break 50
SP 1:    if it's 100 bux every 25 pips then at least another 200
Phillips:  Sell 100 pls.
Phillips:  Try.get [sic] it thru

100.    Pursuant to Phillips's instructions, SP 1 and the Bank 3 trader sold aggressively. At or around 7:43 p.m. ET (12:43 a.m. UTC on December 26, 2017), Phillips again instructed SP 1 to "[t]ry [to] get it thru now," to which SP 1 responded, "I will let you know as soon as we sell any below the figure." One minute later, less than one hour after Phillips first contacted SP 1, SP 1 and the trader executed a USD/ZAR spot trade for Phillips at the rate of 12.4990 rand per dollar, effectively triggering OT Option 1.

101.    Immediately at that point, Phillips instructed SP 1 to stop selling and asked SP 1 to send him a system printout of the final transaction as proof that the USD/ZAR rate had breached the 12.50 rand per dollar barrier level:

SP 1:    we just sold at 4990

> SP 1:     we are finishing now, will be 725mio all day
> SP 1:     done
> Phillips:  Pls.get [sic] me prof [sic] of the print
> Phillips:  And stip
> Phillips:  Stop
> SP 1:     4990 has traded, i am not sure when reuters will update
> SP 1:     understood
> Phillips:  Thanks
> SP 1:     we have done 725mio all day and not doing any more
> Phillips:  Thanks
> Phillips:  Where is it now
> SP 1:     D2 is showing 12.4975 as the low
> SP 1:     that's sufficient yeah?
> Phillips:  Perfect

102.     As SP 1 reported, and as a direct result of Phillips's trading, the USD/ZAR rate fell even further to 12.4975 rand per dollar moments after Phillips placed his final order.

103.     Other Glen Point Capital and Bank 3 employees, including employees based in New York, were participants in the Bloomberg chat room in which Phillips engaged in these trades.

104.     In total, Phillips, acting through Glen Point Capital, sold approximately $725 million as a result of these transactions on behalf of the Glen Point Commodity Pools.  The Glen Point Commodity Pools included U.S. pool participants through the Feeder Funds.

105.     Comparatively, Phillips's Christmas Day USD/ZAR trading was massive. Between January 2017 and November 2018, Glen Point Capital traded the spot USD/ZAR pair through Bank 3 on 107 days.  On average, Glen Point Capital traded net long and short spot positions of approximately $28 million per day during that time period.  The $725 million USD/ZAR that Phillips transacted on Christmas Day was approximately 9.6 times larger than any other net long USD/ZAR position that Glen Point Capital traded at Bank 3 on any other day during that almost two-year period.

106.     As demonstrated above, during a roughly one-hour period, which began late on

Christmas Day (in the United States) and ended in the early morning hours of Boxing Day (in the

United Kingdom), Phillips succeeded in his Manipulative Scheme to drive down the USD/ZAR

exchange rate to trigger the payout on OT Option 1 by placing massive orders to sell USD/ZAR.

107.    Phillips placed these orders without any regard for profit or loss on the trades,

failing to heed the warning from Bank 3, because he knew that he would more than make up for

any losses with the $20 million payout his trades were intended to and did in fact trigger.

108.    Phillips placed these orders knowing that at that time there was very little

liquidity in the USD/ZAR market.

109.    Less than one hour after Phillips stopped trading, the price trend reversed as non-

manipulative market forces price corrected, and as a result, the USD/ZAR rate recovered to

nearly 12.55 rand per dollar.  The pair returned to its original price of 12.62 rand per dollar by

the following morning.

### 2.    Immediately Following the Spot Trades at Bank 3, Glen Point Capital Seeks Confirmation that the Barrier Event Tied to OT Option 1 Occurred

110.    Phillips confirmed that his spot trading was for the purpose of triggering OT

Option 1 when only seven minutes after he stopped trading spot, he instructed another Glen Point

Capital employee ("Employee B") to notify Intermediary Firm 1 the following morning that OT

Option 1 had been triggered.  As instructed, Employee B emailed a representative of

Intermediary Firm 1 a few hours later requesting confirmation that OT Option 1 had been

triggered, which the representative promptly provided.

111.    In addition, almost immediately after Phillips placed his final spot order at Bank

3, at or around 8:00 p.m. ET on December 25, 2017, a New York-based trader for the New York-

based GPCA ("Employee A") messaged a New York-based employee of a major international

bank through Bloomberg's instant messaging tool and asked that the bank employee confirm the

"low print" for the night in the USD/ZAR currency pair.  The bank employee responded to Employee A that the pair had traded once at the rate of 12.4975 rand per dollar and that "12.50 was given many times."  In response to getting confirmation that the pair had traded at a level that had triggered OT Option 1, Employee A responded, "Lovely."

112.    Shortly thereafter, Phillips notified other Glen Point Capital employees through instant messages that the Barrier Event had occurred and that the USD/ZAR currency pair had reached a low of 12.4975 rand per dollar.

### 3.    SP 1 Notes Irregularities in Phillips's Manipulative Trading

113.    Immediately after receiving and facilitating Phillips's orders on Christmas Day, SP 1 called his supervisor, SU, to give him a full account of SP 1's interaction with Phillips and to express concerns about Phillips's blatant intention to execute trades below the barrier level.

114.    SP 1 informed SU that SP 1 had just finished executing large USD/ZAR orders for Phillips and that Phillips had used language in their communications that suggested he intended to move and control the USD/ZAR exchange rate.  SP 1 explained to SU that Phillips was overtly trying to move the rate below 12.50 rand per dollar and that it was obvious that Phillips had some kind of derivative position tied to that barrier level.

115.    Specifically, SP 1 reported to SU:  "We just sold a lot of dollar/rand for Neil. And I was as generic as possible in the chat but it was very clear that he [Phillips] was trying to get a print below 12.50 so he obviously had some kind of barrier there."

116.    SP 1 remarked to SU that Phillips was "very explicit" in his communications and that SP 1 tried to not directly respond to Phillips's directives.  SP 1 further commented to SU:  "I just wanted you to be aware because there wasn't really any way I could tell [Phillips], 'No, we're just gonna stop while I confirm with compliance or whatever.'"

117.    Later in their conversation, SP 1 and SU discussed the trades in greater detail:

SU:     So what did he say?  He just said 'sell dollars'?  You sold dollar/rand—
SP 1:   Yeah but he was very—
SU:     Did it hit the level—
SP 1:   He was very explicit, saying 'I need 12.4990 to print.'
SU:     Okay and did it print in the end?
SP 1:   Yes.
SU:     And was that just because you kept selling or because we made it print?
SP 1:   Because we kept, well, it was a combination of both.  But yeah, because we kept selling.  There were bids, which I assume were either central bank bids or whoever was on the other side of the barrier.  Basically every 25 pips the closer we got to 12.50, it'd be 'Okay bid for a hundred, bid for a hundred.'  Then we finally like, then there was a 12.50 bid.  We gave some there.  And he just kept saying, 'Okay, sell another hundred.'  I would keep him posted, keeping him posted on liquidity whatever.  Then he'd say, 'Okay, sell another hundred.'  Then he would ask me like, 'Okay, how much do you think there is on the bid between so and so.'  And I would say, 'Well, there's no way for me to tell because the bids are hidden but . . .'
SU:     And how much did you end up selling for him?
SP 1:   725 bucks.
SU:     Jesus.

118.    Bank 3, in its internal review of Philips's trading, acknowledged that SP 1 "received and facilitated a $725m USD/ZAR spot client order in circumstances where the client [Phillips on behalf of Glen Point Capital] used language which appeared to suggest an intention to move the market."

**4.      As Intended, Phillips's Manipulation of the USD/ZAR Exchange Rate Results in the Glen Point Commodity Pools Receiving the $20 Million Payout on OT Option 1**

119.    On or about December 27, 2017, the Head of Operations for Glen Point Capital notified Prime Broker 1's FX Prime Brokerage team that the spot price of the USD/ZAR currency pair had breached the barrier level set by OT Option 1.  Prime Broker 1 then proceeded to process the cash flows associated with the settlement of OT Option 1.

120.    Despite the GP Master Fund's obligation as the Calculation Agent to act in good faith and in a commercially reasonable manner in determining the occurrence of the Barrier

Event, at no point during this or any other communication did anyone from Glen Point Capital disclose to Prime Broker 1 the trades that Phillips had conducted through Bank 3 on December 25, 2017.

121.     Consequently, the GP Master Fund failed to notify Prime Broker 1 that the manipulative trades triggering the payout on OT Option 1 were actually placed by Phillips.

122.     That same day, Bank 1 delivered the payout through a chain of wire transfers via multiple bank accounts.  Bank 1's payment of $20 million ultimately landed at Prime Broker 1, which wired the funds to U.S.-based accounts held by the Glen Point Commodity Pools. Specifically, Prime Broker 1 made a payment of $15,660,000 to the GP Master Fund's U.S. Account and another payment of $4,340,000 to Client 1's U.S. Account.

123.     On or about December 28, 2017, Prime Broker 1 also submitted information related to the triggering of OT Option 1 to the DTCC.  In its submission, Prime Broker 1 again identified itself and Client 1 as "U.S. Persons" pursuant to Part 45 of the Regulations.

**5.     Phillips Continues His Manipulative Scheme by Ordering Additional USD/ZAR Spot Trades to Push Prices Down to Trigger the $10 Million Payout on OT Option 2**

124.     Just days after triggering OT Option 1, Phillips again orchestrated a series of spot trades at Bank 3 with the intent of driving down the USD/ZAR exchange rate below the barrier level of 12.25 rand per dollar in order to trigger the $10 million payout tied to OT Option 2.

125.     During the early morning hours of December 28, 2017, with the USD/ZAR currency pair trading at around 12.27 rand per dollar, just .02 rand per dollar from the barrier level, Phillips contacted SP 1 again at the same Bank 3 trading desk and requested to sell $100 million in the pair.

126.     Phillips was still intently monitoring movements in the USD/ZAR exchange rate

26

at this time, and just one day prior, he had reviewed the terms of OT Option 2 with Employee B and confirmed that the payout on the contract was $10 million.

127.    One minute after placing the order with SP 1, Phillips instructed SP to stop trading.  SP 1 informed Phillips that at that point the Bank 3 trader handling the order had sold $21 million at an average spot price of 12.2645 rand per dollar.

128.    A few hours later, Phillips contacted Employee B through Bloomberg's instant messaging tool and directed him to sell $100 million in the USD/ZAR pair.  Employee B immediately contacted SP 2, a different salesperson at Bank 3, and asked to sell $100 million in the pair.  At that time, the USD/ZAR exchange rate was hovering around 12.2554 rand per dollar.

129.    SP 2 began fulfilling the order, and within approximately three minutes, he had sold $35 million on Glen Point Capital's behalf.

130.    At that point, another Glen Point Capital employee ("Employee C") contacted SP 2 for an update on the order Employee B had placed.  SP 2 confirmed to Employee C that he was working on the order and asked if Glen Point Capital had a limit.  Employee C responded that SP 2 should just "keep going" and "go through 2490," meaning trade through 12.2490 rand per dollar—below the barrier level that would trigger the $10 million payout on OT Option 2.

131.    SP 2 then replied that he had already reached that level, which meant that OT Option 2 had been triggered.  Phillips immediately commented to Employee B "[w]e thru," an acknowledgement that Glen Point Capital had just breached the barrier level on OT Option 2.  Phillips then instructed Employee B to stop selling the USD/ZAR currency pair.

132.    In a telephone call about one minute later, Employee C asked SP 2 to confirm the "low print" in the USD/ZAR currency pair.  SP 2 stated that it was 12.2452, to which Employee

C replied "That's great."  SP 2 also asked whether he should resume filling the rest of the

original $100 million order that Employee B had placed.  Employee C directed SP 2 not to fill

the rest of the order and to "stop doing anything."

133.     In total, Phillips and the other traders acting at his direction sold a total of $56

million in the USD/ZAR currency pair through Bank 3 on December 28, 2017.

134.     Just like what had transpired on Christmas Day, as soon as Phillips and the other

Glen Point Capital traders stopped selling the USD/ZAR pair, the price trend reversed as non-

manipulative market forces price corrected.  The USD/ZAR rate recovered to 12.30 rand per

dollar only an hour after they stopped trading and was hovering around 12.33 rand per dollar by

the end of the day.

      **6.**    **As Intended, Phillips's Manipulation of the USD/ZAR Exchange Rate
Results in the Glen Point Commodity Pools Receiving the $10 Million Payout
on OT Option 2**

135.     Also on December 28, 2017, a little more than an hour after the Glen Point

Capital traders had finished selling the USD/ZAR pair at Bank 3, the Head of Operations for

Glen Point Capital notified Prime Broker 1's FX Prime Brokerage team that the spot price had

breached the barrier level set by OT Option 2.  Again, at no point did anyone from Glen Point

Capital disclose to Prime Broker 1 or Bank 2 that Phillips and the Glen Point Capital traders

were responsible for the manipulative trades conducted through Bank 3 on December 28, 2017.

136.     Prime Broker 1 then proceeded to process the cash flows associated with the

settlement of OT Option 2.

137.     On or about January 17, 2018, Bank 2 delivered the $10 million payout to Prime

Broker 1, which then distributed the funds to the Glen Point Commodity Pools.  On that same

date, Prime Broker 1 made a payment of $7,880,000 to the GP Master Fund's U.S. Account and

another payment of $2,120,000 to Client 1's U.S. Account.

       **7.**      **The Consummation and Settlement of Phillips's Spot Orders in New York**

138.    The USD/ZAR spot trades executed by Phillips and Glen Point Capital through Bank 3 on December 25, 2017 and December 28, 2017 were settled through the Settlement Bank in New York.

139.    During the Relevant Period, Bank 3, acting through one of its sister entities, was a settlement member of the Settlement Bank and maintained a multicurrency account with the company.  Bank 3 and its affiliate handled all payment instructions and funding on behalf of Glen Point Capital in connection with the settlement process facilitated by the Settlement Bank.

140.    On or about December 25, 2017 (December 26, 2017 UTC), Bank 3, via its affiliate, sent instructions to the Settlement Bank for the purpose of settling the USD/ZAR order that Phillips had placed that evening.  The Settlement Bank then settled the trades on or about December 28, 2017.

141.    As part of the settlement process, the U.S. dollars associated with the trades Phillips placed flowed through accounts held at the Federal Reserve Bank of New York.

142.    To fill Phillips's massive Christmas Day order, Bank 3 engaged in trades with multiple counterparties.  All of those trades were also settled through the Settlement Bank in New York, which as described above involved transfers of U.S. dollars through the Federal Reserve Bank of New York.  The counterparty to five of these trades was a U.S.-based bank that executed them on behalf of a U.S-based customer and submitted the transactions to the Settlement Bank for settlement.

143.    Settlement Bank records reflect that the $725 million worth of USD/ZAR that Phillips sold on Christmas Day constituted more than seventy percent of all the USD/ZAR

transactions the Settlement Bank cleared during Phillips's selling spree that day.

144.    Also on or about December 28, 2017, Bank 3, via its affiliate, sent instructions to the Settlement Bank for the purpose of settling the USD/ZAR orders that Phillips and the other Glen Point Capital traders had placed that morning in connection with the triggering of OT Option 2.  The Settlement Bank then settled those trades on or about January 2, 2018.  As part of the settlement process, the U.S. dollars associated with the trades also flowed through accounts held at the Federal Reserve Bank of New York.

**E.    Glen Point Capital Failed to Diligently Supervise Phillips's Handling of the OT Options**

145.    Glen Point Capital had a compliance program in effect during the Relevant Period that consisted of written policies and procedures, among other components.  Those policies and procedures specifically addressed the issue of market abuse.

146.    As of June 2017, Glen Point Capital's own Compliance Manual (the "Manual") stated that "[i]t is prohibited for a person to engage in or attempt to engage in market manipulation."  The Manual defined market manipulation to include, among other things, "entering into a transaction, placing an order to trade or any other behavior which . . . secures or is likely to secure, the price of one or several financial instruments [or] a related spot commodity contract . . . at an abnormal or artificial level . . . ."

147.    The Manual also provided examples of manipulative behaviors, including "creating or being likely to create a false or misleading signal about the supply of, or demand for, or price of, a financial instrument, in particular by entering orders to initiate or exacerbate a trend."

148.    The Manual noted that certain indicators may be taken into account to determine whether manipulative activity had occurred, including "the extent to which orders to trade given

or transactions undertaken are concentrated within a short time span in the trading session and lead to a price change which is subsequently reversed," and "the extent to which orders to trade are given or transactions are undertaken at or around a specific time when reference prices, settlement prices and valuations are calculated and lead to price changes which have an effect on such prices and valuations."

149.    Glen Point Capital also adopted a "Code of Ethics" that set forth standards for the ethical conduct of its employees.  Among other requirements, the Code of Ethics obligated employees to abide by the firm's market abuse policies.

150.    Phillips signed an Attestation form in which, among other representations, he certified that he would observe and comply with Glen Point Capital's procedures to prevent market abuse.

151.    Phillips's trading activities on December 25, 2017 and December 28, 2017, which consisted of concentrated transactions that were executed in short time spans and led to changes in the USD/ZAR currency pair spot price that were subsequently corrected by non-manipulative market forces, and which were undertaken within days of the OT Options expiring, met the parameters of Glen Point Capital's self-defined indicia of potential manipulative activity. However, the firm's program of supervision either failed to detect or ignored this activity.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and**
**Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2021)**
**Use of Manipulative or Deceptive Device in Connection With OT Option 1**
**Against All Defendants**

152.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

153.    7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

use or employ, or attempt to use or employ, in connection with any swap . . . in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

154.    17 C.F.R. § 180.1(a) provides:

It shall be unlawful for any person, directly or indirectly, in connection with any swap … in interstate commerce … to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

155.    OT Option 1 is a swap within the meaning of Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A), and is subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) and to the provisions of Section 2(i) of the Act, 7 U.S.C. § 2(i).

156.    As described above, beginning on at least December 25, 2017 and continuing through at least December 28, 2017, Defendants, in connection with OT Option 1, engaged in the Manipulative Scheme to depress the USD/ZAR exchange rate in order to cause the Barrier Event tied to that contract and trigger and obtain the $20 million payout, to the detriment of Bank 1, the counterparty to the transaction.

157.    By the foregoing conduct, Defendants directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or manipulative device, scheme, or artifice to defraud, and Defendants engaged in such conduct willfully, intentionally,

32

or recklessly.

158.    By the foregoing conduct, Defendants directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or engaged or attempted to engage in an act, practice, or course of business which operated or would operate as a fraud or deceit upon the counterparty to OT Option 1, the other intermediaries involved in the transaction, the participants in the Glen Point Commodity Pools, and other market participants, and Defendants engaged in such conduct willfully, intentionally, or recklessly.

159.    As described above, the activities relating to OT Option 1, which is a swap under the Act, including Phillips's manipulation of the spot price of USD/ZAR to trigger the payout on OT Option 1, had a direct and significant connection with activities in, or effect on, commerce of the United States in accordance with 7 U.S.C. § 2(i).

160.    At all times relevant to this Complaint, GPCA and GPC have been registered with the Commission as CPOs.  Phillips was also registered with the Commission during the Relevant Period as an Associated Person of a CPO.  The foregoing conduct involves the very activity that Defendants purposefully and voluntarily registered with the Commission to be able to undertake—operation of a commodity pool.  Accordingly, the conduct is subject to the Commission's regulatory and enforcement authority.

161.    Phillips committed the acts and omissions alleged herein within the scope of his employment or office at Glen Point Capital.  Therefore, Glen Point Capital is liable as a principal for all of Phillips's acts and omissions in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

162.    As a Co-CIO and principal owner of Glen Point Capital, Phillips controlled Glen

Point Capital throughout the Relevant Period and failed to act in good faith or knowingly induced its violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  Therefore, Phillips is liable for Glen Point Capital's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

163.    During the Relevant Period, GPCA and GPC acted as a common enterprise. GPCA and GPC are therefore jointly and severally liable for one another's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

164.    Each and every overt act in furtherance of the use or attempted use of a manipulative or deceptive device or contrivance is alleged herein as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## **COUNT TWO**

### **Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2021)**
**Use of Manipulative or Deceptive Device in Connection With OT Option 2 Against All Defendants**

165.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

166.    7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap . . . in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

167.    17 C.F.R. § 180.1(a) provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap … in interstate commerce … to intentionally or recklessly:

34

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

168.    OT Option 2 is a swap within the meaning of Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A), and is subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) and to the provisions of Section 2(i) of the Act, 7 U.S.C. § 2(i).

169.    As described above, beginning on at least December 28, 2017 and continuing through at least January 17, 2018, Defendants, in connection with OT Option 2, engaged in the Manipulative Scheme to depress the USD/ZAR exchange rate in order to cause the Barrier Event tied to that contract and trigger and obtain the $10 million payout, to the detriment of Bank 2, the counterparty to the transaction.

170.    By the foregoing conduct, Defendants directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or manipulative device, scheme, or artifice to defraud, and Defendants engaged in such conduct willfully, intentionally, or recklessly.

171.    By the foregoing conduct, Defendants directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or engaged or attempted to engage in an act, practice, or course of business which operated or would operate as a fraud or deceit upon the counterparty to OT Option 1, the other intermediaries involved in the transaction, the participants in the Glen Point Commodity Pools, and other market participants, and Defendants engaged in such conduct willfully, intentionally, or recklessly.

35

172.    As described above, the activities relating to OT Option 2, which is a swap under the Act, including Phillips's manipulation of the spot price of USD/ZAR to trigger the payout on OT Option 2, had a direct and significant connection with activities in, or effect on, commerce of the United States in accordance with 7 U.S.C. § 2(i).

173.    At all times relevant to this Complaint, GPCA and GPC have been registered with the Commission as CPOs.  Phillips was also registered with the Commission during the Relevant Period as an Associated Person of a CPO.  The foregoing conduct involves the very activity that Defendants purposefully and voluntarily registered with the Commission to be able to undertake—operation of a commodity pool.  Accordingly, the conduct is subject to the Commission's regulatory and enforcement authority.

174.    Phillips committed the acts and omissions alleged herein within the scope of his employment or office at Glen Point Capital.  Therefore, Glen Point Capital is liable as a principal for all of Phillips's acts and omissions in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

175.    As a Co-CIO and principal owner of Glen Point Capital, Phillips controlled Glen Point Capital throughout the Relevant Period and failed to act in good faith or knowingly induced its violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  Therefore, Phillips is liable for Glen Point Capital's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

176.    During the Relevant Period, GPCA and GPC acted as a common enterprise. GPCA and GPC are therefore jointly and severally liable for one another's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

177.    Each and every overt act in furtherance of the use or attempted use of a manipulative or deceptive device or contrivance is alleged herein as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## COUNT THREE

### Violations of Regulation 166.3, 17 C.F.R. § 166.3 (2021)
**Failure to Supervise Against All Defendants**

178.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

179.    During the Relevant Period, GPCA and GPC, acting as a common enterprise and doing business as Glen Point Capital, and through their officers, employees, and agents, violated 17 C.F.R. § 166.3 by employing an inadequate supervisory system and failing to perform their supervisory duties diligently.  Specifically, Glen Point Capital violated 17 C.F.R. § 166.3 by, among other things, failing to establish, implement, and/or adhere to policies and procedures for the detection and deterrence of possible manipulative trading conduct by its officers, employees, and agents.

180.    At all times relevant to this Complaint, GPCA and GPC have been registered with the Commission as CPOs, and therefore 17 C.F.R. § 166.3 applies to them.

181.    Phillips committed the acts and omissions alleged herein within the scope of his employment or office at Glen Point Capital.  Therefore, Glen Point Capital is liable as a principal for all of Phillips's acts and omissions that constitute violations of 17 C.F.R. § 166.3 pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

182.    As a Co-CIO and principal owner of Glen Point Capital, Phillips controlled Glen Point Capital throughout the Relevant Period and failed to act in good faith or knowingly induced its violations of 17 C.F.R. § 166.3.  Therefore, Phillips is liable for Glen Point Capital's

violations of 17 C.F.R. § 166.3 as a controlling person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

183.    During the Relevant Period, GPCA and GPC acted as a common enterprise. GPCA and GPC are therefore jointly and severally liable for one another's violations of 17 C.F.R. § 166.3.

184.    Each act in violation of 17 C.F.R. § 166.3, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 166.3.

## VII.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.    An order finding that Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. §§ 166.3, 180.1(a) (2021);

B.    An order of permanent injunction enjoining each Defendant and any other person or entity associated with them, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with each Defendant, including any successor thereof, from:

   i.    Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. § 9(1) and 17 C.F.R. §§ 166.3, 180.1(a) (2021);

   ii.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

   iii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for their own

personal account(s) or for any account in which Defendants have a direct or indirect interest;

iv.  Having any commodity interests traded on their behalf;

v.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vi.  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vii.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

viii.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9));

D.  An order requiring Defendants to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, see Regulation 143.8, 17 C.F.R. § 143.8

(2021), for each violation of the Act or Regulations, plus post-judgment interest;

E.   An order directing Defendants, as well as any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

F.   An order directing Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations (in the amount of such losses), as described herein, plus pre-judgment interest thereon from the date of such violations, plus post-judgment interest;

G.   An order requiring Defendants, as well as any successors thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

H.   An order providing such other and further relief as the Court deems proper.

*     *     *

## VIII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial.

Dated: December 15, 2022

**COMMODITY FUTURES TRADING COMMISSION**

s/ Jonah E. McCarthy
Jonah E. McCarthy (S.D.N.Y. Bar No. JM1977)
Senior Trial Attorney
jmccarthy@cftc.gov
Phone: (202) 418-5000

Lauren E. Bennett
Trial Attorney
lbennett@cftc.gov
Phone: (202) 418-5000

Julia C. Colarusso
Trial Attorney
jcolarusso@cftc.gov
Phone: (202) 418-5000

A. Daniel Ullman II (S.D.N.Y. Bar No. AU2471)
Chief Trial Attorney
dullman@cftc.gov
Phone: (202) 418-5000

Paul G. Hayeck
Deputy Director
phayeck@cftc.gov
Phone: (202) 418-5000

1155 21st Street, NW
Washington, DC 20581
Phone: (202) 418-5000
Fax: (202) 418-5428

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION